United States District Court
Middle District of Florida
Jacksonville Division

**AMBER I. MCRANEY,**

    *Plaintiff,*

**V.**            **NO. 3:17-CV-339-J-34PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

    *Defendant.*

---

# Report & Recommendation

  This is a case under 42 U.S.C. §§ 405(g) and 1383(c)(3) to review a final decision of the Commissioner of Social Security denying Amber McRaney's claim for disability insurance benefits and supplemental security income.[1] McRaney seeks reversal and remand, raising issues concerning the Administrative Law Judge's ("ALJ's") reliance on a vocational expert's ("VE's") testimony, failure to find two impairments severe, treatment of several doctors' opinions, failure to include certain limitations in the residual functional capacity ("RFC"), and failure to order an IQ test.

---

[1] The Social Security Administration ("SSA") uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of a denial of benefits. *Bowen v. City of New York*, 476 U.S. 467, 471−72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 404.900−404.906, 416.1400−416.1406. If dissatisfied with the initial determination, the claimant may ask for reconsideration. 20 C.F.R. §§ 404.907−404.918, 416.1407−416.1418. If dissatisfied with the reconsideration determination, the claimant may ask for a hearing before an Administrative Law Judge ("ALJ"). 20 C.F.R. §§ 404.929−404.943, 416.1429−416.1443. If dissatisfied with the ALJ's decision, the claimant may ask for review by the Appeals Council. 20 C.F.R. §§ 404.967−404.982, 416.1466−416.1482. If the Appeals Council denies review, the claimant may file an action in federal district court. 20 C.F.R. §§ 404.981, 416.1481.

## I.      Background

McRaney was born in 1986. Tr. 277. She completed high school, attending special education classes from 2000 to 2006. Tr. 314. She has worked as a restaurant cashier and seasonal Walmart employee.[2] Tr. 303, 325. She states she stopped working in December 2012 when the seasonal work ended. Tr. 314. She alleges she became disabled in June 2011 from learning disabilities, mental illness, excessive weight, self-esteem issues, manic depression, inability to understand how to make adult decisions, bipolar issues, back problems from gross obesity, "problems with instruction both personal and work," "issues in all aspects of life/relationships," and inability to "relate to actions/with consequences."[3] Tr. 125. She is insured through June 2015.[4] Tr. 285. She proceeded through the administrative process, failing at each level. This case followed. Doc. 1.

## II.     ALJ's Decision

The ALJ conducted a hearing on December 7, 2015, at which McRaney was represented by a non-lawyer friend and former employer.[5] Tr. 70, 72–73. The decision under review is the ALJ's decision dated February 2, 2016. Tr. 64. The time period for disability insurance benefits is June 2011 (the alleged onset date) to June 2015 (the date last insured). The time period for supplemental security income is January

---

[2]McRaney also briefly worked "on call" for a day care. Tr. 328. She also participated in Job Corps but alleges she could not pass the exam. Tr. 314–15.

[3]A disability report reflects that the Commissioner previously denied benefits in 2005. Tr. 300. There is no further information about the prior application in the record.

[4]In her brief, McRaney states "the [disability benefits] determination explanations … stated that the date last insured was March 31, 2012 [but] the certified earnings record documents and the ALJ properly determined that [McRaney] was last insured through June 30, 2015, so the [disability benefits] determinations at the initial and reconsideration stages failed to assess Plaintiff's disability status for the period [after] March 31, 2012." Doc. 20 at 3 (internal citations omitted). McRaney does not raise any issue concerning the date last insured or the periods the ALJ considered.

[5]The ALJ continued an earlier hearing because McRaney stated she might want representation and indicated some records might be missing. Tr. 115, 117–21.

2013 (the application date), Tr. 279, to February 2016 (the date of the ALJ's decision).

At step one,[6] the ALJ found McRaney has not engaged in substantial gainful activity since June 1, 2011 (the alleged onset date). Tr. 51. The ALJ found that work she performed at Walmart in November and December 2012 was not substantial gainful activity. Tr. 51.

At step two, the ALJ found McRaney suffers from severe impairments of diabetes mellitus with neuropathy, migraine headaches, hypertension, obesity, depressive disorder, psychotic disorder, post-traumatic stress disorder, and learning disorder in special education classes. Tr. 51. He found her back pain and bronchitis not severe. Tr. 52.

At step three, the ALJ found McRaney has no impairment or combination of impairments that meets or medically equals the severity of any impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 53. He considered the "paragraph B" criteria and found she has mild restrictions in activities of daily living; marked difficulties in social functioning; moderate difficulties maintaining concentration, persistence, and pace; and has had no episode of decompensation of extended duration. Tr. 53–54. He also considered the "paragraph C" criteria and found she does not meet them.[7] Tr. 54.

---

[6]The SSA uses a five-step sequential process to decide if a person is disabled, asking whether (1) she is engaged in substantial gainful activity, (2) she has a severe impairment or combination of impairments, (3) the impairment or combination of impairments meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) she can perform any of her past relevant work given her RFC, and (5) there are a significant number of jobs in the national economy she can perform given her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant has the burden of persuasion through step four. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

[7]The paragraph B criteria are used to assess functional limitations imposed by medically determinable mental impairments. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(C). Paragraph B requires a disorder of medically documented persistence resulting in at least two of the following: (1) marked restriction of activities of daily living;

After stating he had considered the entire record and summarizing the medical evidence, the ALJ found that McRaney has the RFC to perform light work[8] with additional limitations:

> She requires a sit or stand option, which allows for a change of position at least every 30 minutes. That would be a brief positional change lasting no more than 3 minutes at a time, and she would remain at the workstation during that positional change. In an 8-hour workday, she can sit up to 6 hours, stand up to 6 hours, and walk up to 6 hours. She can push and pull as much as she can lift and carry. The claimant is limited to occasional use of foot controls and occasional use of hand controls. She can occasionally climb ramps and stairs, but never climb ladders and scaffolds. She can frequently balance, stoop, and crouch; occasionally kneel; and can never crawl. She should not work around unprotected heights or moving mechanical parts. She should avoid any environments with concentrated exposure to humidity, wetness, and dust, fumes, and gases. She must avoid any temperature extremes. The claimant is limited to simple tasks and simple work-related decisions, with no more than occasional interaction with supervisors and co-workers, and no interaction with the general public. Time off task would be accommodated by normal breaks.

Tr. 54.

At step four, the ALJ found McRaney cannot perform her past relevant work.[9] Tr. 62.

---

[2] marked difficulty maintaining social functioning; (3) marked difficulty maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, App'x 1 §§ 12.04, 12.06. Paragraph C lists additional functional criteria for some listings. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(A).

[8] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567, 416.967(b).

[9] "Past relevant work is work [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough … to learn to do it." 20 C.F.R. §§ 404.1560, 416.960.

4

At step five, the ALJ found McRaney could perform the jobs of marker, sub assembler, and office helper, and those jobs exist in significant numbers in the national economy. Tr. 63. The ALJ therefore found no disability. Tr. 63–64.

### III.   Medical Evidence[10]

In August 2010, McRaney made the first of many visits to Clay Behavioral Health Center for problems associated with a divorce. Tr. 431. She reported "trying college but not working out … special ed all through school, comprehension problems, reading problems, math problems." Tr. 431. The same month, a report from Clay Behavioral listed her strength as "intelligent." Tr. 447. The following month, a provider at Clay Behavioral assessed "intellectual impairment: probable borderline intellectual function/poor comprehension/very limited vocabulary," Tr. 437, and diagnosed her on Axis II with borderline intellectual function.[11] Tr. 441. A report from the next visit, in May 2011, noted she had gotten a job at McDonald's and a car and was "doing okay." Tr. 445.

A September 2011 medical exam shows all physical categories, including "spine" and "musculoskeletal," were normal. Tr. 489. (It is unclear who performed this medical exam.)

There are several medical records from Jacksonville Job Corps starting in 2011. It often is unclear who provided treatment, and summaries of multiple

---

[10]Not all medical evidence is summarized here. Other summaries are in the parties' briefs, Docs. 20 and 24, and the ALJ's decision, Tr. 52–62.

[11]The fourth edition of the Diagnostic and Statistical Manual of Mental Disorders (text revision 2000) ("DSM-IV-TR") provides, "A multiaxial system involves an assessment based on several areas, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome. There are five axes included in the DSM-IV multiaxial classification": Axis I (clinical disorders and other conditions that may be a focus of clinical attention); Axis II (mental retardation and personality disorders); Axis III (general medical conditions); Axis IV (psychosocial and environmental problems); and Axis V (the GAF). DSM-IV at 27.

appointments are listed on one document. *See, e.g.*, Tr. 493–96. In June 2011, she reported headaches but no back pain, and her health was described as "good." Tr. 487. An August 2011 "Chronic Care Management Plan [for] Depressive Disorders" discusses plans to enhance employability, like establishing a plan for current or returning symptoms, evaluating a need for mental health resources, and educating her on coping skills. Tr. 483. Paperwork that appears to be from other visits directs her to lose weight, eat healthy, and increase physical activity. Tr. 482. A January 2012 "Chronic Care Management Plan Flowsheet–Obesity" lists a co-morbid condition of "asthma." Tr. 480. Later that month, she appeared for a follow-up for "acute wheeze, cough, [and] congestion." Tr. 495. She was prescribed albuterol and an inhaler. Tr. 495–96, 498. In June 2012, she reported that psycho-social stressors were making her feel depressed, and her medication was increased. Tr. 507. In September 2012, she reported increased sadness and stress related to her fiancé, school, and missing child, and the provider recommended increasing Prozac. Tr. 491.

In June 2012, a provider with Clay Behavioral completed a discharge summary. The report explained McRaney had not visited for more than a year. Tr. 449. The summary listed "client dropped out" as the reason for discharge and noted an opening and closing Global Assessment of Functioning ("GAF") rating of 52.[12] Tr. 449.

---

[12]The former version of American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000), includes the GAF scale used by mental-health practitioners to report "the clinician's judgment of the individual's overall level of functioning" and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." Manual at 32−34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id.* A GAF rating of 21 to 30 indicates behavior considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or inability to function in almost all areas. Manual at 34. A GAF rating of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.* A GAF rating of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF rating of 61

In March 2013, McRaney saw Janet K. Humphreys, Ph.D., for a consultative psychological exam. Tr. 542. Dr. Humphreys reviewed 2011 "chart notes" from Clay Behavioral. Tr. 542. McRaney reported, among other things, thinking of her childhood abuse daily, being irritable from lack of sleep, having poor concentration, losing 50 pounds in two years, having suicidal ideation, having heard a female voice for two years telling her she is a bad mother, having panic attacks every few hours when alone, and being hypervigilant. Tr. 542–43. Dr. Humphreys noted McRaney "is not currently being treated with any psychotropic medication [and] has never been hospitalized for any psychiatric problems." Tr. 543. McRaney reported she could care for her personal needs, drive, shop, cook, and clean, and could not find work since her seasonal position ended. Tr. 543. She reported that her mother pays her bills for her and she spends her days looking for work and taking care of her child. Tr. 543. She reported attending a social event once or twice a month. Tr. 543.

Dr. Humphreys recounted McRaney's background and history, including that she suffers from asthma and back problems due to obesity. Tr. 543. Dr. Humphreys then provided observations on McRaney's mental status:

A.   General Attitude and Behavior: Ms. McRaney's mother drove her to the examination, and remained present during the interview. Ms. McRaney was a short, obese woman, who had her glasses dangling from her t-shirt. She spoke spontaneously at a normal rate in a hoarse tone of voice. She indicated that she gets hoarse when stressed. She was teary throughout the examination. No peculiarity of gait or involuntary movement was noted. She was cooperative and appeared to be a reliable historian, but had difficulty providing details of her history.

B.   Mood and Affect. Her mood was anxious and depressed; her affect was expressive. She admitted to passive suicidal ideation, but

---

to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id*.

The latest edition of the Manual abandoned the GAF scale because of "its conceptual lack of clarity … and questionable psychometrics in routine practice." Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

strongly denied intent and plan. She denied homicidal ideation, intent, and plan.

C.    Thought Processes: Logical and goal oriented.

D.    Content of Thought: She believes that people in general want to hurt her.

E.    Perceptual Disturbances: She indicated that she heard a voice telling her that she needed to go hide in a corner during examination.

F.    Judgment and Insight: Good for hypothetical situations.

G.    Sensorium Functioning:

Orientation: Well oriented to person, place, and time.

Memory: Immediate memory was characterized by the repetition of four digits forward and four digits backward. She was able to recall two of three objects after about five minutes, but could not recall the third even with a clue. Remote memory appeared to be impaired; she could not provide details of her history.

Information: She was able to name the current president, prior president, and two oceans. She thought Pensacola was the capital of Florida.

Calculation: She indicated that she could not perform serial sevens subtraction or the mental addition of double-digit numbers. She was able [to] perform simple addition, but indicated that she could not multiply.

Abstract thinking: She was unable to interpret either of two common sayings

Tr. 543–44.

Under "Diagnostic Impression," Dr. Humphreys stated that McRaney reported symptoms consistent with mood disorder, psychotic disorder, panic disorder, and posttraumatic stress disorder. Tr. 544. She opined McRaney's mood and anxiety "likely impact her perception of pain" and McRaney appeared to function at a low intellectual level. Tr. 544. For Axis I, Dr. Humphreys diagnosed mood disorder, psychotic disorder, panic disorder without agoraphobia, post-traumatic stress disorder (chronic), and pain disorder "associated with both psychological factors and a general medical condition." Tr. 544. For Axis II, Dr. Humphreys diagnosed mild mental retardation and borderline intellectual functioning. Tr. 544. Dr. Humphreys

opined McRaney's prognosis was "guarded [and she] may benefit from a pharmacological evaluation and psychotherapy as well as IQ testing." Tr. 544. Regarding McRaney's ability to do work-related activities, Dr. Humphreys opined her "concentration, immediate, recent, and remote memory appeared impaired, and may impact her ability to carry out complex instructions. Her social skills and judgment as well as her ability to perform simple repetitive tasks may be affected by her psychosis." Tr. 545. Regarding McRaney's competency to manage funds, Dr. Humphreys opined she would benefit from assistance. Tr. 545.

In March 2013, McRaney visited Robert Greenberg, M.D., P.A., for a consultative physical examination. Tr. 537. On a chart showing limitations in motion (like flexion, extension, and rotation), McRaney was normal in all areas (wrist, hand, knee, cervical spine, shoulder, elbow motion) except she was limited in lumbar spine extension, forward, and lateral flexion. Tr. 535–36. She reported having bipolar disorder and learning disabilities, no longer having funds for treatment from Clay Behavioral, finishing high school in a special education class, having difficulty reading and writing, and having been in a 2006 car accident that caused non-radiating lumbar pain aggravated by bending and lifting. Tr. 537. She reported obtaining mild relief from taking Tylenol daily. Tr. 537.

Dr. Greenberg noted nothing abnormal concerning McRaney's constitution, skin, eyes, ears, nose, throat, heart, blood, gastrointestinal system, genitourinary organs, neurological system, memory, and endocrine system. Tr. 537–38. Regarding her lungs, Dr. Greenberg noted "no recent history of coughing, unclear phlegm, hemoptysis, wheezing, pain on breathing, chest congestion, or recent inhalant exposure." Tr. 538. Regarding her head, Dr. Greenberg noted "no recent history of headaches, head injuries, or head nodules." Tr. 537.

Based on a physical exam, Dr. Greenberg noted she appeared alert and cooperative, had a "very flat" affect, and was "very slow to answer questions." Tr. 539. He noted she was not wheezing. Tr. 539. He noted she had "no abnormal curvature

of the cervical, thoracic, or lumbar spine"; had decreased range of motion in the lumbar spine; had normal gait and station; had no need for an assistive device for ambulation; could tandem walk and walk on her heels and toes but could not stoop; had no straight leg raising pain; and had no tenderness over the spine. Tr. 539. He noted she had full range of motion in extremities and 5/5 grip strength. Tr. 539. A neurological exam showed she was alert and oriented to time, place, and person, and had good muscular coordination and strength bilaterally. Tr. 539. He diagnosed her with bipolar disorder with learning disability and chronic low back pain "probably secondary to lumbar osteoarthritis from previous injury, aggravated by obesity." Tr. 539. Under "Recommendations," he wrote, "I felt that this claimant should be able to perform most work-related activities that do not require heavy lifting or bending. Her mental disorder may cause difficulty in her obtaining gainful employment. She definitely needs medication for her bipolar disorder." Tr. 539.

In March 2013, at the initial level, state agency consultant B. Lee Hudson, Ph.D., reviewed the medical evidence. Tr. 130–31. After summarizing the evidence, he stated,

> [McRaney's] functional [status report] form [is] written in first and third person. The content is internally inconsistent and inconsistent with the objective evidence of record, thus considered partially credible. MSO from mental [consultative exam] vendor assumes full credibility of claimant's alleged mental symptoms w/o consideration of the inconsistencies. Thus, the MSO is given some, but not great, weight in the present case analysis.
>
> There are many credibility issues. Claimant alleged mental symptoms occurring for long periods of time at mental [consultative exam], yet did not report these symptoms when she received treatment. At mental [consultative exam], claimant was alleging severe mental symptoms which typically result in in-patient psychiatric hospitalization, yet there is no history of in-patient psychiatric treatment and claimant quit outpatient mental treatment in 5/2011. No additional [medical evidence of record] available for review. Claimant also reported she was working despite these alleged severe symptoms. Given the severity of symptoms claimant alleged at mental [consultative exam], this is highly atypical and draws claimant's credibility into question. Claimant alleged history

> of special education due to learning disability. There is no evidence from schools to verify this. There are entries in [medical evidence of record] questioning claimant's IQ but no longitudinal intellectual assessments available for review and no recent IQ assessments. Given the credibility issues, IQ assessment is not advised due to likelihood results would be invalid. Based on the objective evidence of record, claimant's ADLs are no more than mildly limited. Giving some benefit of doubt to claimant's allegations, Social and CPP limitations warranted, but of no more than Mild Severity. In sum, claimant's mental symptoms do not meet or equal listing level severity. See MRFC.

Tr. 131.

Dr. Hudson opined McRaney is not significantly limited in her ability to remember locations and work-like procedures and understand and remember very simple and short instructions. Tr. 134. He opined she is moderately limited in the ability to understand and remember detailed instructions. Tr. 134. He opined she is not significantly limited in her ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 134–35. He opined she is moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, and sustain an ordinary routine without special supervision. Tr. 135.

Dr. Hudson opined McRaney is not significantly limited in her ability to ask simple questions or request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. Tr. 135. He opined she is moderately limited in her ability to interact appropriately with the general public, accept instructions, respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 135. He opined she is not significantly limited in her ability to set

realistic goals or make plans independently of others, travel in unfamiliar places or use public transportation, and be aware of normal hazards and take appropriate precautions. Tr. 136. He opined she is moderately limited in her ability to respond appropriately to changes in the work setting. Tr. 135.

Dr. Hudson stated,

> Claimant retains the functional capacity to perform self-care and [household] chores [within] physical tolerances, can prep simple meals, drive, shop and count change. Claimant can read and watch television. Attention, concentration and memory were mildly to moderately limited at mental [consultative exam]; however, claimant retains the functional capacity to understand, remember and carry out simple, and some moderately detailed, instructions. Although moderate limitations would be present in ability to sustain normal routine without supervision during initial learning phase of novel tasks, this limitation would dissipate over time.
>
> Claimant reported conflicts with others, but indicated positive relationships with family and interacted appropriately with stranger at mental [consultative exam]. Claimant is able to relate adequately with others in low social demand settings. Claimant can adapt to changes in work setting after initial adjustment period.

Tr. 136.

In March 2013, McRaney returned to Clay Behavioral for an evaluation with Daphne Hayes, ARNP. Tr. 548–50. McRaney reported "hear[ing] self-deprec[ating] voices putting her down." Tr. 548. Hayes noted McRaney had an appropriate appearance, motor activity within normal limits, a cooperative attitude, a clear sensorium, intact cognitive functions, speech quality and content within normal limits, perception within normal limits, a dysphoric mood, a blunted affect, a history of ideation with potential for suicide, and fair insight and judgment. Tr. 550. For Axis I, she diagnosed "MDE [major depressive episodes]." Tr. 550. For Axis II, she wrote "questionable IQ." Tr. 550. She assigned a GAF rating of 50.

In a May 2013 mental status exam with Hayes, McRaney had an appropriate

appearance, motor behavior within normal limits, a cooperative attitude, speech quality and content within normal limits, perception within normal limits with no distortions or hallucinations, a clear sensorium, intact cognitive functions, a euthymic mood, a broad affect, and a good response to medication. Tr. 551. Hayes assigned a GAF rating of 50. Tr. 551. In a progress note, she noted "Doing well on meds; looking for a job; [looks like] limited but stable; and no psychosis." Tr. 551.

In May 2013, at the reconsideration level, state agency consultant Alicia Maki, Ph.D., reviewed the mental evidence. She "affirmed" Dr. Hudson's findings and adopted the same limitations and summary without elaboration.[13] Tr. 167–72.

In June 2013, at the reconsideration level, Harry Beecham, M.D., reviewed the physical evidence. Tr. 168–70. He opined McRaney could occasionally lift or carry 50 pounds; frequently lift or carry 25 pounds; stand or walk for 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; and push or pull the same amount she could lift or carry. Tr. 168–69. He explained he relied on x-rays and CT scans from March 2006 and "obesity BMI 51, deconditioning, and lumbago." Tr. 169. He opined she could frequently climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. Tr. 169. He opined she has no manipulative, visual, communicative, or environmental limitations. Tr. 169–70. Under "Additional Explanation," he cited evidence from the consultative exam with Dr. Greenberg and wrote, "CL is without significant neurologic deficits, extremity weakness or severe gait disturbances. Severe obesity – BM 51, and its effects on stamina and deconditioning, and lumbago are considered in the reduction of this RFC." Tr. 170.

Between September 2014 and March 2015, McRaney visited Azalea Health for primary care. She received treatment from mainly from nurse practitioners, but there

---

[13]One signature by Dr. Maki is dated June 4, 2013. Tr. 167. The other is dated May 30, 2013. Tr. 172.

is one documented visit with Suzanne Hooker, M.D. The visits often were for routine check-ups or physical ailments not at issue here, *see* e.g., Tr. 615–30, sometimes discussing diet and exercise for her diabetes, Tr. 617. Relevant here, in September 2014, McRaney reported anxiety, trouble concentrating, feelings of guilt, diminished interest or pleasure, suicidal ideation, and normal respiratory efforts. Tr. 617, 626. In October 2014, she reported a history of asthma and a headache.[14] Tr. 611–12. In November 2014, she had no chronic cough or dyspnea (shortness of breath) but had headaches. Tr. 605–06. In February 2015, she presented for leg pain, reported back pain, and was instructed to wear more supportive shoes and elevate her feet when sitting. Tr. 601–03. In March 2015, she had no dyspnea. Tr. 581.

Later in March 2015, McRaney visited Azalea Health for a headache and depression. Tr. 591. She reported having had a headache for about a week and having anxious and fearful thoughts, excessive worries, fatigue, and a loss of appetite. Tr. 591. The report states that her depression "is associated with headache, irritability, and nausea," but otherwise noted she was doing well on medication. Tr. 591. She reported having done well on Prozac but having stopped taking it for insurance reasons, and the provider directed her to restart Prozac. Tr. 591, 594. For headaches, she was directed to increase fluids, take Ibuprofen, continue anti-nausea medication, and report to an emergency room if symptoms had not improved within a few days. Tr. 594–55.

A few days later, McRaney returned to Azalea Health with complaints of nausea. Tr. 585. The provider noted her headaches had resolved, Tr. 585, and she was negative for headaches and anxiety, Tr. 587.

McRaney visited Azalea Health three times in April 2015. Tr. 564–73. She first presented with a rash she reported possibly having gotten from pulling weeds outside. Tr. 573. At that visit, she had no chronic cough. Tr. 575. She next presented with a

---

[14]It appears McRaney may have been prescribed albuterol and an inhaler.

facial lesion. Tr. 567. At that visit, under "Disease/disorder," the report listed anxiety, depression, and obesity, and indicated she had no headaches. Tr. 568–69. She next presented with musculoskeletal pain in both feet and was prescribed Gabapentin. Tr. 561, 564. She was positive for anxiety and depression and negative in all other areas. Tr. 563.

During a May 2015 visit to Azalea Health, McRaney presented with a cough, ankle pain, and depression. Tr. 554. For her depression, she reported an "improvement of initial symptoms." Tr. 554. The provider noted she presented with fatigue "but denie[d] anxious/fearful thoughts, diminished interest or pleasure or thoughts of death or suicide." Tr. 554. A "problem list" listed Type II diabetes mellitus, hyperlipidemia, seborrheic dermatitis, benign essential hypertension, depressive disorder, inflamed seborrheic keratosis, and poorly controlled type 2 diabetes. Tr. 554–55. She had a frequent harsh cough, had tenderness in her left achilles, had mild pain with motion where her left ankle had been hurting, had normal memory, was oriented, had an appropriate mood and affect, and was not agitated or anxious. Tr. 558. Under "Assessment/Plan," for asthma, she was directed to take albuterol "every 4 hours as needed for wheezing" and to increase fluids and not smoke. Tr. 558. Regarding her depression, the report indicated, "Doing well on Prozac." Tr. 558.

In September 2015, McRaney visited Azalea Health with complaints of headaches, back pain, and fatigue. Tr. 636. She reported her headaches had worsened and were aggravated by bright lights and noise. Tr. 636. She had no cough or dyspnea. Tr. 639. She exhibited an inappropriate mood and affect. Tr. 640. Though diabetic, she reported drinking two sodas daily. Tr. 640. The provider noted, "Needs a note for SSI stating she can't work at this time. … Request screening for ADHA, mother told her she was tested for a learning disorder when she was a child, [s]tates she is forgetful, and has difficulty concentrating."[15] Tr. 636. McRaney reported a gradual

---

[15]The request for a disability note came after her application had already been denied at the initial and reconsideration levels. *See* Tr. 196 (notice of denial at

onset of pain without injury over eight years. Tr. 636. She described the pain as persistent in her lower back and relieved by over-the-counter medication and rest. Tr. 636. She also reported fatigue. Tr. 636. For her physical ailments, the provider directed her to take Ibuprofen, use warming and ice packs, get massages, stretch, refrain from carrying heavy objects close to the body, use her legs and hips instead of her back to lift things from the floor, and get a lumbar x-ray. Tr. 637. The provider also recommended increasing Prozac. Tr. 637. The provider assessed lumbago and counseled her on the importance of health and exercise. Tr. 640.

The same month, McRaney returned to Azalea Health for a follow-up for chronic conditions. Tr. 634. This is the only time in which it was noted that Dr. Hooker—as opposed to a nurse practitioner—saw her. Dr. Hooker referred her to neurology and reported "headache off/on for 1 year, worse in the last month," "CT scan of brain at starke April negative," "been taking gabapentin for months for neuropathy."[16] Tr. 634.

In September 2015, Dr. Hooker wrote a letter "to whom it may concern." Tr. 633. She wrote that McRaney "is unable to work due to intractable migraine. She has been referred to neurology." Tr. 633.

In October 2015, Dr. Hooker wrote a second letter "to whom it may concern." Tr. 552. She wrote that McRaney "is unable to work due [to] medical issues of Migraines, chronic daily headaches, diabetes, neuropathy, and chronic diarrhea from medication." Tr. 552 (copied again at Tr. 632).

The ALJ conducted a hearing in December 2015. Among other testimony, McRaney testified the only bill she has is her rent bill, which includes utilities and is $500 a month, Tr. 102, and she gets on her mother's computer once daily to check her

---

reconsideration level dated June 5, 2013).

[16]There is no report of a CT scan or reports from any neurology provider in the record. The only radiology report in the record is from 2006. Tr. 406–11.

"bank account, Facebook, anything involving … child support, Social Security … 'mainly just business type things.'" Tr. 103–04.

## IV.     Standard of Review

A court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports his findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* A court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.* A court must affirm an ALJ's decision if substantial evidence supports it, even if other evidence preponderates against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

## V.     Law & Analysis

To obtain benefits, a claimant must demonstrate she is disabled. 20 C.F.R. §§ 404.1512(a), 416.912(a). A claimant is disabled if she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).[17]

An ALJ must consider all relevant record evidence. 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). But "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad

---

[17]The Commissioner substantially revised the regulations on the consideration of medical evidence for claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 5844-01, 5844 (Jan. 18, 2017). McRaney filed her claims before that date. All citations, with the exception of citations related to the listings, are to the regulations in effect on the date she filed her claims.

rejection which is not enough to enable [the Court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal quotation marks omitted).

## A.   *Vocational Expert*

McRaney contends the ALJ violated Social Security Ruling ("SSR") 00-4p because he failed to ask the VE whether her testimony conflicts with the Dictionary of Occupational Titles ("DOT"). Doc. 20 at 14. Relatedly, she contends the ALJ erred by stating he based the sit/stand option on the VE's professional experience because he never asked the source of the VE's testimony regarding the sit/stand option, Doc. 20 at 14 (citing Tr. 105–10), and Social Security Ruling 83-12 states unskilled jobs (which the VE said McRaney could perform) usually do not allow a sit/stand option, Doc. 20 at 15–16.

At step five, an ALJ must determine whether there are a significant number of one or more jobs the claimant can perform in the national economy. 20 C.F.R. §§ 404.1566(b), 416.966(b). The SSA "will take administrative notice of reliable job information available from various governmental and other publications," including the DOT, census reports, county business patterns, and the Occupational Outlook Handbook by the Bureau of Labor Statistics. 20 C.F.R. §§ 404. 1566(d), 416.966(d).

For the step-five determination, an ALJ may use a VE's testimony. *Winschel v. Comm'r Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011). For a VE's testimony to be substantial evidence, the ALJ must pose a hypothetical question that includes all of the claimant's impairments. *Id.* An ALJ is "not required to include findings in the hypothetical that he had properly rejected as unsupported." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004).

SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000), governs the use of VE testimony. It provides,

When there is an apparent unresolved conflict between VE or [vocational specialist ("VS")] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence. ... As part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on [that] testimony rather than on the DOT information.

...

When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that ... evidence and information provided in the DOT. In these situations, the adjudicator will: [a]sk the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and if the ... evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704 at *2, 4.

SSR 83-12 provides:

[M]ost jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

SSR 83-12, 1983 WL 31253, at *4 (Jan. 1 1983).

SSRs are agency rulings published under the Commissioner's authority and binding on all components of the Social Security Administration ("SSA"). *Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990). They are not binding on a court but may be entitled to great respect and deference. *B.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th

Cir. Unit B. 1981); *see Stein v. Reynolds Sec. Inc.*, 667 F.2d 33, 34 (11th Cir. 1982) (Eleventh Circuit is bound by decisions issued by Unit B panels of the former Fifth Circuit). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same. A ruling may be superseded, modified, or revoked by later legislation, regulations, court decisions, or rulings." *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984) (internal citation omitted).

In *Jones v. Apfel*, the Eleventh Circuit held that "when the VE's testimony conflicts with the DOT, the VE's testimony trumps the DOT … because the DOT is not the sole source of admissible information concerning jobs." 190 F.3d 1224, 1229–30 (11th Cir. 1999) (internal quotation marks omitted). Applying *Jones*, the Eleventh Circuit has held that because the VE's testimony trumps the DOT, an ALJ does not err by relying on VE testimony without first resolving any alleged conflict. *Miller v. Comm'r of Soc. Sec.*, 246 F. App'x 660, 662 (11th Cir. 2007); *Hurtado v. Comm'r of Soc. Sec.*, 425 F. App'x 793, 796 (11th Cir. 2011).

The SSA published SSR 00-4p after the Eleventh Circuit decided *Jones*. In an unpublished decision rendered after the publication, the Eleventh Circuit clarified, "To the extent SSR 00-4p conflicts with *Jones* [in that SSR 00-4p says VE testimony does not automatically trump the DOT when they conflict], [the Eleventh Circuit is] bound by *Jones*." *Jones v. Comm'r of Soc. Sec.*, 423 F. App'x 936, 939 n.4 (11th Cir. 2011). In a recent case, the Eleventh Circuit reiterated:

> Assuming without deciding that the vocational expert's testimony and the DOT were inconsistent, Baker's contention fails because we have held that "the VE's testimony 'trumps' the DOT" whenever the two conflict. … Baker asserts that a Social Security Administration ruling titled SSR 00-4p "superseded" our *Jones* decision. That ruling cannot have superseded *Jones* because it lacks the "force and effect of the law." *Heckler v. Edwards,* 465 U.S. 870, 874 n.3, 104 S.Ct. 1532, 1535 n.3, 79 L.Ed.2d 878 (1984). Undeterred, Baker invites us to "publish a written decision finding that [SSR 00-4p] is entitled to great respect and deference." We cannot accept that invitation because we are bound to

apply the rule from *Jones* unless it is overruled by the Supreme Court or by this Court sitting en banc.

*Baker v. Comm'r of Soc. Sec.*, 729 F. App'x 870, 872, 872 n.2 (11th Cir. 2018) (internal citation omitted).

At the hearing here, the ALJ asked the VE if the resume in the file was a true description of her professional qualifications, and she answered yes. Tr. 106. The VE then briefly recounted her experience, stating she has a master of health science in rehabilitation counseling, has worked in the field since 1987, and, besides working as a VE for the SSA, has her own vocational-training business. Tr. 106. She testified she could give an impartial opinion, did not discuss her testimony with McRaney or the ALJ before the hearing, and read McRaney's file and listened to her testimony. Tr. 108. She described McRaney's past work as unskilled, Tr. 108, and the ALJ asked her to identify jobs based on a hypothetical mirroring the RFC later included in his decision, Tr. 109–10. She identified unskilled jobs McRaney could perform with and without a sit/stand option. Tr. 109–10.

In explaining his decision at step five, the ALJ wrote, "Pursuant to SSR 00-4p, the undersigned has determined that the VE's testimony is consistent with the information contained in the Dictionary of Occupational Titles except in regards to the option to sit and/or stand which was based on the VE's professional experience." Tr. 63.

While the ALJ failed to ask the VE if her testimony was consistent with the DOT, the failure does not constitute reversible error because SSR 00-4p is not binding and the VE's testimony trumps any inconsistency with the DOT.[18] *See Baker,* 729 F.

---

[18]The undersigned notes this Court has previously held that an ALJ must reconcile any inconsistent testimony between a VE and the DOT in accordance with SSR 00-4p. *Leonard v. Astrue*, 487 F. Supp. 2d 1333, 1333–40 (M.D. Fla. 2007) (J. Howard). That case pre-dated *Miller* and the later Eleventh Circuit cases addressing the reconciliation of *Jones* and SSR 00-4p, and the Court specifically observed that "[t]he Eleventh Circuit has not addressed SSR 00-4p." *Id.* at 1339.

App'x at 872, 872 n.2; *Jones,* 423 F. App'x at 939 n.4; *Hurtado,* 425 F. App'x at 796; *Miller,* 246 F. App'x at 662; *see also Gaines v. Colvin,* No. 8:14-CV-125-T-TGW, 2015 WL 769926, at *3 (M.D. Fla. Feb. 23, 2015) (unpublished) ("While the law judge did not specifically ask [if the VE's testimony conflicted with the DOT], the law judge could reasonably find that the expert's testimony was consistent with the DOT because the vocational expert stated the DOT number for each of the jobs she identified. … Furthermore, even if the law judge had failed to comply with SSR 00–4p, that would not warrant reversal because SSR 00–4p is neither a statute nor a regulation and therefore does not have the force of law. … Moreover, the Commissioner correctly argues that, assuming there is a conflict between the expert's testimony and the DOT, the expert's testimony prevails.") (internal citations omitted); *Ballard v. Astrue,* No. 2:10-CV-765-FTM-29, 2012 WL 139205, at *2 (M.D. Fla. Jan. 18, 2012) (unpublished) ("No binding authority holds that an ALJ has an affirmative duty to ask the VE whether there is a conflict between his or her opinion and the DOT. … Because Social Security Rulings are not binding on the court, there was no error in this case in relying upon the testimony of the vocational expert.").

For the same reason, McRaney's argument that the ALJ erred by stating he based the sit/stand option on the VE's experience fails. The ALJ did not explicitly ask her basis for the sit/stand option, but he could reasonably infer it was. SSR 83-12 does not mandate that an unskilled position is incompatible with a sit/stand option. It states that "in cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base." 1983 WL 31253 at *4. The ALJ did that here and consulted the VE for jobs that include a sit/stand option. Even if the VE's testimony was inconsistent with the DOT under SSR 83-12, because her testimony "trumps" the DOT, any inconsistency does not warrant remand.

McRaney contends the ALJ found Dr. Greenberg's restrictions were "not inconsistent with the RFC and gave some weight to the opinion"; Dr. Greenberg stated McRaney could not perform work-related activities that require bending;

SkillTran descriptions of the jobs the VE identified (attached to McRaney's brief) show those jobs may include bending; and "the VE did not provide any basis for her statement that they can be performed by [a person who cannot bend.]" Doc. 20 at 15–16; Docs. 20-1, 20-2, 20-3.

The ALJ included no outright prohibition on bending but limited McRaney to frequent stooping and crouching and never crawling, among other limitations. The VE did not have to consider a "no bending" limitation because that was not included in the ALJ's hypothetical (and ultimate RFC). To the extent McRaney argues substantial evidence does not support the ALJ's rejection of that limitation, that argument will be addressed later in this report and recommendation in addressing her challenges to the ALJ's treatment of the medical opinions.

Remand for reconsideration of the step-five finding is unwarranted.

## B.   *Severity of Impairments*

McRaney contends the ALJ erred in failing to find her back pain and breathing problems (identified by the ALJ as "bronchitis") severe. Doc. 20 at 18–20.

At step two, the SSA decides if the claimant has a severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A severe impairment is an impairment that significantly limits a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (defining "non-severe impairment"). An impairment must be severe for at least 12 consecutive months. 20 C.F.R. §§ 404.1505(a), 404.1509, 404.1520(a)(4)(ii).

"Step two is a threshold inquiry." *McDaniel v. Bowen,* 800 F.2d 1026, 1031 (11th Cir. 1986). It "acts as a filter" to eliminate claims involving no substantial impairment. *Jamison v. Bowen,* 814 F.2d 585, 588 (11th Cir. 1987). "[T]he finding of any severe impairment ... whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe" satisfies step two.

*Id.* If an ALJ identifies at least one severe impairment at step two and moves to step three, a claimant "cannot demonstrate error" because "the ALJ's recognition" of additional severe impairments "would not, in any way, have changed the step-two analysis." *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 F. App'x 949, 951 (11th Cir. 2014); *accord Delia v. Comm'r of Soc. Sec.*, 433 F. App'x 885, 887 (11th Cir. 2011) (holding substantial evidence did not support ALJ's finding at step two that plaintiff's mental impairments were not severe but concluding the error was harmless because the ALJ found other severe impairments and considered the mental impairments at later steps).

Though an ALJ need not identify at step two all impairments that should be severe, he must demonstrate he considered all of the claimant's impairments—severe and not severe—in combination at step three and in assessing a claimant's RFC. *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 825 (11th Cir. 2010); 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

*1.     Back Pain*

The ALJ explained why he found McRaney's back pain not severe:

> At the March 2013 consultative examination, the claimant related a history of back injury in a 2006 motor vehicle accident with reported constant pain treated with over-the-counter medication (Exhibit 9F). At the hearing, the claimant alleged back pain related to epidural injections associated with her 8-year-old daughter's birth. However, in June 2011, the claimant denied any musculoskeletal pain or limitations (Exhibit 4F/38). A review of the medical record does not reflect significant complaints of back pain to her treating providers on any persistent basis, or clinical observations or findings on physical examinations of a back condition that has resulted in significant associated functional limitations. In September 2015, the claimant was diagnosed with lumbago and conservative treatment, including massage, ice/heat, stretching, and the use of a muscle relaxer and over-the-counter pain medication was recommended. Lumbar spine x-rays

were requested (Exhibit 14F), but at the December 2015 hearing the claimant reported that she had had no spinal imaging studies.

…

However, consistent with the regulations, the undersigned considered all of the claimant's impairments, including impairments that are not severe, when assessing the [RFC].

Tr. 52.

McRaney's argument concerning the ALJ's finding that her back pain is not severe fails for two reasons. First, substantial evidence supports the finding. As the ALJ explained, many visits with Azalea Health showed complaints of conditions without back pain, *see, e.g.* Tr. 573, 591, 615–30; a September 2011 exam showed the spine and musculoskeletal system were normal, Tr. 489; there were no significant and persistent complaints of back pain to treating providers, and symptoms were managed with conservative treatment like using ice and heat and taking over-the-counter medications, Tr. 52 (citing Tr. 637). Second, even assuming error, any failure to include back pain as a severe impairment at step two is harmless because the ALJ found she has other severe impairments and moved past step two.[19] *See Jamison*, 814 F.2d at 588.

Remand to reconsider McRaney's back pain is unwarranted.

---

[19]McRaney does not contend the ALJ failed to consider her back pain in combination with severe impairments, and any such contention would be unfounded. The decision and the RFC make clear the ALJ considered her back pain in combination with all of her impairments. The RFC includes a sit-stand option; a 6-hour sitting limitation; a 6-hour standing limitation; a 6-hour walking limitation; and limitations of occasionally climbing ramps and stairs; never climbing ladders and scaffolds; frequently balancing, stooping, and crouching; occasionally kneeling; and never crawling. McRaney has not explained how those physical limitations in the RFC fail to account for any back pain. Moreover, evidence McRaney cites from a physical therapist and massage therapist on her low back pain, Doc. 20 at 19, post-dates the ALJ's decision and does not undermine the RFC.

2.   *Breathing Impairments*

The ALJ explained why he found McRaney's breathing impairments not severe:

> The claimant testified that she had been asthmatic all her life, with the condition worsening since adulthood. However, a review of the medical record does not reveal a diagnosis of asthma from an acceptable medical source. The claimant was assessed with asthma by a nurse practitioner in May 2015 (Exhibit 13F), but this is not an acceptable medical source for the purposes of establishing whether an individual has an impairment under the regulations (20 CFR §404.1513(a) and §416.913(a)). Medical treatment records reflect a history of bronchitis with wheezing diagnosed by a doctor (Exhibit 4F/46, 49). In June 2011, the claimant denied any history of shortness of breath or other breathing problems (Exhibit 4F/38). At the consultative examination performed in March 2013, the claimant did not report any history of significant respiratory problems and no respiratory abnormalities were identified on physical examination (Exhibit 9F). The claimant presented with cold symptoms in October 2014 and said she had been diagnosed with asthma two years ago, but denied having an inhaler (Exhibit 13F/59). Medical treatment records from 2015 do not document ongoing complaints or symptoms of respiratory problems, and there is no evidence the claimant has required emergent treatment or hospitalization for respiratory symptoms, suggesting satisfactory control of symptoms with minimal treatment. A review of the medical file does not reveal evidence of objective pulmonary function testing.

Tr. 52.

McRaney's argument concerning the ALJ's finding that her breathing impairment is not severe likewise fails for two reasons. First, substantial evidence supports the ALJ's finding. As the Commissioner observed, often when a medical provider noted wheezing or coughing, McRaney had been suffering from bronchitis or other nasal congestion with cold-symptoms. Doc. 24 at 15 (citing Tr. 451, 495–96, 557). No doctor listed a breathing impairment as a diagnosis that would prevent her from working. Many reports reflect no wheezing or coughing or a normal respiratory system. *See, e.g.*, Tr. 538, 575, 605–06, 617, 626. Second, even assuming error, any failure to include a breathing impairment as a severe impairment at step two is

harmless because the ALJ found she has other severe impairments and moved past step two.[20] *See* *Jamison*, 814 F.2d at 588.

Remand to reconsider McRaney's breathing impairment is unwarranted.

## C.   *Doctor's Opinions and RFC*

McRaney contends the ALJ erred in rejecting Dr. Humphreys' opinion that psychosis may affect her ability to perform simple and repetitive tasks, Doc. 20 at 16; the ALJ erred in giving substantial weight to the opinions of the state agency consultants and failing to include in the RFC several mental limitations specifically addressed by them, Doc. 20 at 17–18, 21; and the ALJ erred in not incorporating the bending limitation by Dr. Greenberg, Doc. 20 at 15–16.

A claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The SSA uses the RFC at step four to decide if the claimant can perform any past relevant work and, if not, at step five with other factors to decide if there are other jobs in significant numbers in the national economy

---

[20]McRaney does not contend the ALJ failed to consider any breathing impairment in combination with severe impairments, and any such contention would be unfounded. The ALJ included limitations in the RFC that address her breathing problems. Specifically, the RFC includes that she should avoid any environments with concentrated exposure to humidity, wetness, and dust, fumes, and gases. *See* *Stewart v. Colvin*, No. 7:14-CV-898-KOB, 2015 WL 3616082, at *13 (N.D. Ala. June 9, 2015) (unpublished) ("[T]he ALJ lists several nonexertional limitations that apply to her RFC. The first limitation—the claimant can have no concentrated exposure to extreme heat, odors, dust, gases, or other asthma irritants—is an environmental limitation that considers the claimant's limitations from her asthma."); *Stottler v. Astrue*, No. 8:09-CV-1719-T-TBM, 2010 WL 3833679, at *7 (M.D. Fla. Sept. 28, 2010) (unpublished) ("As for Plaintiff's contention that the ALJ ignored the severity of her asthma, a review of the decision does not bear that out. … The ALJ took this impairment into consideration in her RFC findings such that she determined Plaintiff 'must avoid a concentrated exposure to chemicals, humidity, temperature extremes, dust, fumes or gasses.'") McRaney does not explain how those limitations fail to account for asthma or any breathing problem or what additional limitations would be necessary.

she can perform. 20 C.F.R. §§ 404.1545(a)(5), 416.945(a)(5). The "mere existence" of an impairment does not reveal its effect on a claimant's ability to work or undermine RFC findings. *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). The ALJ need not defer to any medical opinion concerning the RFC. *See* 20 C.F.R. §§ 404.1527, 416.927(d)(3).

Regardless of its source, the SSA "will evaluate every medical opinion" it receives. 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Opinions on issues that are dispositive of a case, such as whether a claimant is disabled or able to work, are not medical opinions because they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

Within the classification of acceptable medical sources are: (1) a treating source, which is "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you"; (2) a non-treating source, which is "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you"; and (3) a non-examining source, which is "a physician, psychologist, or other acceptable medical source who has not examined you but provides a medical or other opinion in your case ... includ[ing] State agency medical and psychological consultants[.]"[21] 20 C.F.R. §§ 404.1502, 416.902. The SSA will consider several factors to decide the weight to give a medical opinion: examining

---

[21]State-agency medical and psychological consultants are highly qualified and "also experts in Social Security disability evaluation," 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i), and their opinions may be entitled to great weight if the evidence in the record supports them, Social Security Ruling ("SSR") 96-6p, 61 Fed. Reg. 34466, 34467–68 (July 2, 1996).

relationship, treatment relationship, supportability, consistency, specialization, and any other relevant factor. 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ need not explicitly address each factor. *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011).

An opinion of a one-time examining doctor is not entitled to great weight. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). And although "the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

"[R]estricting the claimant to simple and routine tasks adequately accounts for restrictions related to concentration, persistence, and pace where the medical evidence demonstrates that the claimant retains the ability to perform the tasks despite limitations in concentration, persistence, and pace." *Timmons v. Comm'r of Soc. Sec.*, 522 F. App'x 897, 907 (11th Cir. 2013) (citing *Winschel*, 631 F.3d at 1180).

1.   *Dr. Humphreys*

McRaney contends the ALJ erred in rejecting Dr. Humphreys' opinion that psychosis may affect her ability to perform simple repetitive tasks. Doc. 20 at 16. She contends there are repeated references in the record to hearing voices, the state agency consultants found she suffered from schizophrenia or other psychotic disorders, and the ALJ found her psychotic disorder severe. Doc. 20 at 16–17. She contends substantial evidence does not support the ALJ's decision to instead give significant weight to the consultants' opinions and the RFC fails to account for limitations in psychosis. Doc. 20 at 17–18.

The ALJ stated:

In March 2013, Dr. Humphreys opined the claimant's concentration,

29

immediate, recent, and remote memory appeared impaired and may impact her ability to carry out complex instructions. Further, Dr. Humphreys noted the claimant's social skills and judgment, as well as her ability to perform simple repetitive tasks, may be affected by her psychosis (Exhibit l0F/5). The undersigned gives some weight to this opinion insofar as the claimant's limited ability to carry out complex instructions. This is consistent with the record as a whole that indicates the claimant has severe mental impairment[s] and is limited to some extent by this impairment. As such, the undersigned restricted the claimant to simple tasks and simple work-related decisions in the residual functional capacity assessment. Little weight is given to limitations attributed to the claimant's psychosis, as associated symptoms are not documented throughout the mental health treatment notes but, rather, confined to Dr. Humphreys' one-time interview of the claimant. However, the residual functional capacity restricts the claimant to simple tasks and simple work-related decisions performed in a socially limited environment to allow for the claimant's mental impairment.

Tr. 61.

Through that statement, the ALJ stated the weight he was giving Dr. Humphreys' opinion and the reasons for the weight. Substantial evidence supports that reasoning. Regarding psychosis, other than the report of voices to Dr. Humphrey, only one other report—from the same month to an ARNP at Clay Behavioral—reflects that McRaney reported hearing voices. Tr. 548. Two months after the reports to providers in which she stated she heard voices, in a mental status exam at Clay Behavioral, she had perception within normal limits with no distortions or hallucinations and was otherwise normal in almost all areas, including having a euthymic mood, appropriate speech, clear sensorium, and intact cognitive functions. Tr. 551. The report noted she was "doing well on meds," "stable," and had no psychosis. Tr. 551. Between September 2014 and March 2015, while visiting Azalea Health for primary care, Tr. 581–630, she reported mental health issues like depression and anxiety but did not report hearing voices or any other symptoms of psychosis. *See* Tr. 626 (September 2014 visit in which she reported anxiety, difficulty concentrating, feelings of guilt, and diminished interest or pleasure and suicidal

ideation); Tr. 581–611 (reporting only physical complaints and headaches between October 2014 and March 2015). And in the March 2015 reports from Azalea Health, the provider noted depression "associated with headache, irritability, and nausea," directed McRaney to restart Prozac because she reported having previously done well on it, and a few days later she was negative for headaches and anxiety. Tr. 587, 591, 594.

As the Commissioner observes, all the parts of the record to which McRaney cites to support she heard voices, Doc. 20 at 17, are references to "Dr. Humphreys' consultative examination report, or self-reports/third party function reports submitted to the agency in support of her disability applications," Doc. 24 at 10, i.e. not reports from a medical provider.

That the ALJ adopted psychosis as a severe impairment and the state agency consultants found schizophrenia or psychosis as a severe impairment does not mean the ALJ erred in rejecting the psychosis-related limitation of Dr. Humphreys. The "mere existence" of an impairment does not reveal its effect on a claimant's ability to work or undermine RFC findings, *Moore*, 405 F.3d at 1213 n.6, and the ALJ appropriately accounted for any limitations based on the objective medical evidence that showed no other symptoms of psychosis and mental health diagnoses generally managed with outpatient treatment.

Because an ALJ is "not required to include findings in the hypothetical that he had properly rejected as unsupported," *Crawford*, 363 F.3d at 1161, the ALJ did not have to include in the RFC further limitations to address psychosis.

Remand for reconsideration of Dr. Humphreys' opinion is unwarranted.

2.    *State Agency Consultants*

McRaney contends the ALJ erred in giving substantial weight to the opinions of Drs. Hudson and Maki after giving less weight to Dr. Humphreys' opinion. Doc. 20

at 17–18. McRaney also contends the ALJ erred in failing to include in the RFC several mental limitations specifically addressed by the state agency consultants (moderately limited in the ability to maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting). Doc. 20 at 21. She contends "moderate" means "medium," which a Department of Labor handbook defines as "the middle third" and a person limited in those areas from one-third to two-thirds of the time would be "off-task" more than allowed and therefore unemployable. Doc. 20 at 21–22.

The ALJ explained his treatment of the opinions of Drs. Hudson and Maki:

> State agency psychological consultants reviewed the evidence of record and determined the claimant remained capable of understanding, remembering, and carrying out simple, and some moderately detail instructions; performing tasks on a sustained basis; relating adequately with others in low social demand settings; and adapting to changes in a work setting after initial adjustment period (Exhibits 1A, 2A, 5A, and 6A). As per SSR 96-6p, findings of fact made by State agency consultants regarding the nature and severity of an individual's impairments must be treated as expert opinion evidence of non-examining sources. Although the consultants did not have the opportunity to examine the claimant, their findings are consistent with the record as a whole, including the claimant's history of limited mental health treatment and functional abilities and capacities as demonstrated in her daily activities, and have been given significant weight. This is not inconsistent with the recorded GAF ratings, 50-52, indicating only moderate to borderline moderate/severe symptoms or limitations in functioning. Further, it is noted that the claimant's mental health symptoms readily responded to psychotropic medication use. Therefore, some weight was given to the recorded GAF ratings.

Tr. 61.

The ALJ also discussed McRaney's activities of daily living:

32

The claimant has described daily activities that are not limited to the extent expected, given the complaints of disabling symptoms and limitations. Despite her impairments, the claimant remains capable of living independently within her household, parenting her young daughter, adequately tending to her personal care needs, preparing meals, performing routine household chores, driving, shopping, and managing financial transactions. She engages in numerous recreational activities including swimming, going to the park and to her daughter's softball games, watching television and movies, reading, and using the computer. She drives her stepfather to and from work each day, visits her mother regularly, goes to church twice a week, and out to eat occasionally.

The record reflects that since the alleged onset date, the claimant has sought other employment, and actually worked seasonally at Walmart. Although the claimant's short-lived work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's abilities and capacities have been somewhat greater than the claimant has generally reported. The claimant's Walmart work activity reportedly ended because it was seasonal, not because of the claimant's medical condition.

Tr. 59.

The medical evidence discussed in supporting the rejection of some of Dr. Humphreys' opinion, as well as the evidence of McRaney's activities of daily living, adequately supports the ALJ's decision to give the opinions of Drs. Hudson and Maki significant weight. Because their opinions may be entitled to great weight if supported by the evidence, *see* SSR 96-6p, and the ALJ may reject any opinion not supported by the evidence, *Sryock*, 764 F.2d at 835, the ALJ did not err in giving their opinions significant weight while rejecting in part Dr. Humphreys' opinion.

McRaney's argument that the ALJ failed to include mental limitations from Drs. Hudson and Maki fails. Picking out specific limitations undermines the final conclusions of the doctors:

Claimant retains the functional capacity to perform self-care and [household] chores [within] physical tolerances, can prep simple meals, drive, shop and count change. Claimant can read and watch television.

> Attention, concentration and memory were mildly to moderately limited at mental [consultative exam]; however, claimant retains the functional capacity to understand, remember and carry out simple, and some moderately detailed, instructions. Although moderate limitations would be present in ability to sustain normal routine without supervision during initial learning phase of novel tasks, this limitation would dissipate over time.
>
> Claimant reported conflicts with others, but indicated positive relationships with family and interacted appropriately with stranger at mental [consultative exam]. Claimant is able to relate adequately with others in low social demand settings. Claimant can adapt to changes in work setting after initial adjustment period.

Tr. 136. Their final conclusions are consistent with the RFC (limited to simple tasks and simple work-related decisions, with only occasional interaction with supervisors and co-workers, no interaction with the general public, time off task would be accommodated by normal breaks, Tr. 54). *See Timmons*, 522 F. App'x at 907.

Remand for reconsideration of the state agency consultants' opinions is unwarranted.

3.     *Dr. Greenberg*

In arguing the VE did not acknowledge Dr. Greenberg's bending limitation, McRaney appears to argue the ALJ erred in failing to incorporate that limitation when he otherwise found Dr. Greenberg's opinion "not inconsistent" with the RFC. Doc. 20 at 15–16.

The ALJ stated the weight he was giving to Dr. Greenberg's opinion and the reasons:

> On March 7, 2013, Dr. Greenberg opined the claimant was able to do most activities that did not require heavy lifting or bending (Exhibit 9F). Although vague in defining specific limitations, the undersigned finds Dr. Greenberg's restrictions are not inconsistent with the range of light work described in the residual functional capacity above. The undersigned gives some weight to this opinion as it was based on a

> comprehensive examination and is supported by the largely unremarkable physical examination results documented throughout the record, as well as the claimant's course and frequency of treatment.
>
> …
>
> Dr. Greenberg reported the claimant's mental disorder, which he diagnosed as bipolar disorder with learning disability, may cause difficulty in obtaining gainful employment (Exhibit 9F/7). The undersigned gives little weight to this opinion as it was based on the claimant's self-reported diagnosis of bipolar disorder, which is not consistent with the diagnoses of the mental health specialists who evaluated the claimant. However, the residual functional capacity assessment provides limitations to accommodate the claimant's mental impairment.

Tr. 60–61.

The ALJ thus stated the weight he was giving to Dr. Greenberg's opinion and the reasons why. Substantial evidence supports those reasons. As discussed in considering the severity of back pain at step two, many visits with Azalea Health showed complaints of various conditions without back pain, *see, e.g.* Tr. 573, 591, 615–30; a September 2011 exam showed the spine and musculoskeletal system were normal, Tr. 489; there were no significant and persistent complaints of back pain to treating providers, and complaints were managed with conservative treatment, like ice, heat, and over-the-counter medications, Tr. 52 (citing Tr. 637). In the exam with Dr. Greenberg, McRaney had no abnormal curvature of the cervical, thoracic, or lumbar spine; had decreased range of motion in the lumbar spine; had normal gait and station; could tandem walk and walk on her heels and toes but could not stoop; had no tenderness over the spine; had full range of motion in extremities and 5/5 grip strength; and had good muscular coordination and strength bilaterally. Tr. 539. Even though McRaney had made complaints of back pain to providers at Azalea Health, when Dr. Hooker provided the two letters stating she could not work, she did not list back pain or any back impairment as a reason for inability to work. Tr. 552, 633.

Because the ALJ thoroughly reviewed the medical evidence and included a

limitation (just not a total ban) on bending with many other physical limitations, McRaney has not shown his decision is a "broad rejection" that would not enable the Court to conclude he considered her "medical condition as a whole." *See Dyer*, 395 F.3d at 1211 (quoted).

Remand for reconsideration of Dr. Greenberg's opinion is unwarranted.

### D.   *Failure to Develop the Record on Intellectual Disability*

McRaney contends that the findings of a severe impairment of "learning disability in special education classes;" Dr. Humphreys' observations on her intellectual functioning; and references in the record to her inability to handle finances, her inability to make decisions, and her attendance in special classes since a young age "should have triggered the ALJ's obligation to develop the record so he could adequately consider listing 12.05, intellectual disorder." Doc. 20 at 24.

Social-security regulations set forth responsibilities concerning evidence of the claimant and the SSA. 20 C.F.R. §§ 404.1512, 416.912 (2012).

A claimant has the burden of proving disability and the duty of informing or submitting evidence known to the claimant relating to whether she is disabled. 20 C.F.R. §§ 404.1512(a), 416.912(a). The evidence must show how the claimant's impairments affect her functioning during the time she says she is disabled and any other information the SSA needs to decide her claim. 20 C.F.R. §§ 404.1512(c), 416.912(c). The SSA has the burden of developing the claimant's "complete medical history"[22] for at least the twelve months before the application date, 20 C.F.R. §§ 404.1512(d)(2), 416.912(d)(2). The SSA may obtain a consultative examination if needed to determine if the claimant is disabled (for example, if the evidence is not in

---

[22]"Complete medical history means the records of [the claimant's] medical source(s) covering at least the 12 months preceding the month in which [the claimant] file[s an] application." 20 C.F.R. §§ 404.1512(d)(2), 416.912(d)(2).

records from medical sources, the evidence from medical sources cannot be obtained for reasons beyond the claimant's control, there is highly technical or specialized medical evidence unavailable from medical sources, and there is an indication of change in condition but the current severity has not been established). 20 C.F.R. §§ 404.1512(e), 404.1517, 404.1519a(b), 416.912(e), 416.917, 416.919a(b).

"To meet a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." Wilson v. Barnhart, 283 F.3d 1219, 1224 (11th Cir. 2002) (internal quotation marks omitted).

Remand for further development of the record is appropriate "where the record reveals evidentiary gaps which result in unfairness or clear prejudice." Henry v. Comm'r of Soc. Sec., 802 F.2d 1264, 1267 (11th Cir. 2015). "[A]n ALJ is not required to order a consultative examination as long as the record contains sufficient evidence for the ALJ to make an informed decision." Mabrey v. Acting Comm'r of Soc. Sec. Admin., 724 F. App'x 726, 729 (11th Cir. 2018).

Listing 12.05 provides:

12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

37

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpart. P, App'x. 1, § 12.05 (2015).[23] "Standardized intelligence test results are essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A." 20 C.F.R. Pt. 404, Subpart. P, App'x. 1, § 12.00(D)(6)(b) (2015).

"The structure of the listing for intellectual disability (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If [the] impairment satisfies the diagnostic description in the introductory paragraph **and** any one of the four sets of criteria, [the SSA] will find that [the] impairment meets the listing." 20 C.F.R. Pt.

---

[23]The SSA amended the Listings, including Listing 12.05, effective January 2017. 81 Fed. Reg. 66138, 66138 n.1, 66138–66167 (Sept. 26, 2016). The undersigned cites the statute in effect on the date of the ALJ's decision. *See Rudolph v. Comm'r of Soc. Sec. Admin.*, 709 F. App'x 930, 932 (11th Cir. 2017) ("the [SSA] expect[s] the Federal courts will review [its] final decisions using the rules that were in effect at the time [it] issued the decisions").

404, Subpart. P, App'x. 1, § 12.00(A) (2015) (emphasis added).

"Effective September 3, 2013, the [SSA] replaced the term mental retardation with … intellectual disability as a listed impairment. … But this change d[id] not affect the actual medical definition of the disorder or available programs or services. (internal citations and quotations omitted). *Jones v. Soc. Sec. Admin., Comm'r*, 695 F. App'x 507, 508 (11th Cir. 2017). The Eleventh Circuit has recognized the difference between intellectual disability and borderline intellectual functioning. *See Harris v. Comm'r of Soc. Sec.*, 330 F. App'x 813, 815 (11th Cir. 2009) ("Substantial evidence supports the ALJ's denial of disability benefits because Harris did not meet the requirements of Listing 12.05. He was never diagnosed with mental retardation, only borderline intellectual functioning. The ALJ found that Harris did well in special education classes and was able to hold several jobs, which did not indicate the type of deficit in adaptive functioning required for mental retardation. Harris could dress and bathe himself, take care of his personal needs, [manage] money, … read, communicate effectively, and do simple math.").

In evaluating whether McRaney had any listed impairment, the ALJ stated:

> Neither the claimant nor her representative has alleged that she meets or equals any listed impairment. No State agency reviewer, consultant, or examiner has concluded that the claimant has an impairment severe enough to meet or equal a listing. No treating physician has credibly concluded that the claimant has an impairment severe enough to meet or equal a listing. Likewise, the [ALJ] finds that the record does not establish that the claimant has an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1.

Tr. 53.

Dr. Humphreys diagnosed mild mental retardation and borderline intellectual functioning and stated McRaney "may benefit from a pharmacological evaluation and psychotherapy as well as IQ testing." Tr. 544. The ALJ gave significant weight to Dr. Hudson's opinion, in which he discussed Dr. Humphreys' recommendation:

Given the severity of symptoms claimant alleged at mental [consultative exam], this is highly atypical and draws claimant's credibility into question. Claimant alleged history of special education due to learning disability. There is no evidence from schools to verify this. There are entries in [medical evidence of record] questioning claimant's IQ but no longitudinal intellectual assessments available for review and no recent IQ assessments. Given the credibility issues, IQ assessment is not advised due to likelihood results would be invalid. Based on the objective evidence of record, claimant's ADLs are no more than mildly limited.

Tr. 136.

Assessments from Clay Behavioral note "intellectual impairment: probable borderline intellectual function/poor comprehension/very limited vocabulary" (in 2010), Tr. 437, and "questionable IQ" (in 2013), Tr. 550, while other reports from Clay Behavioral or Azalea Health fail to diagnose any intellectual impairment and report she is "intelligent," Tr. 447, and often has appropriate quality and content of speech with, clear sensorium Tr. 550, 551. The record shows she performs several activities (including seasonal work at Walmart, living independently, parenting her child, using her mother's computer to check bank accounts, drive, shop for groceries, perform household chores, and participate in recreational activities like swimming, reading teen-level books, and watching or going to the movies).[24]

---

[24]The Eleventh Circuit has held "[t]here may be an implied finding that a claimant does not meet a listing." *Edwards v. Heckler,* 736 F.2d 625, 629 (11th Cir.1984). Because of that, in cases in which an IQ score has been submitted, even if the ALJ fails to address Listing 12.05(c) at all, courts have affirmed the ALJ's decision because substantial evidence supports that the claimant did not have adaptive deficits in functioning (a requirement in the introductory paragraph). *See, e.g. James v. Comm'r, Soc. Sec. Admin.,* 657 F. App'x 835, 838 (11th Cir. 2016) ("It is true that the ALJ never explicitly discussed whether James met Listing 12.05(c). But a finding [may be implied]. A finding that James lacked adaptive deficits as required under the introductory paragraph of Listing 12.05 can be implied from the ALJ's conclusion that James's prior work experience indicated that she did not have an intellectual disability."). *See also Schrader v. Acting Comm'r of Soc. Sec.,* 632 F. App'x 572, (11th Cir. 2015) (where ALJ did consider 12.05(c) listing specifically, the court affirmed the ALJ's finding that the claimant, with a learning disability who had been in special classes and had an IQ of less than 70, did not meet the listing of 12.05(c) because she did not have deficits in adaptive functioning: she worked one day a week at a laundromat, babysat children, could engage in conversation and

No other providers, including at facilities where providers saw McRaney for several years, diagnosed intellectual disability. Though she was in special education classes, she completed high school, has held different unskilled jobs, and performs a variety of activities of daily living, and the state agency consultant provided a reason an IQ test would be unhelpful.[25] On this record, there is no evidentiary gap, much less one resulting in unfairness or clear prejudice. *See Henry*, 802 F.2d at 1267.

Remand to order an IQ test is unwarranted.[26]

---

communicate effectively, and could perform household chores and prepare simple meals, among other activities).

[25]A recent Eleventh Circuit case ordering remand for an IQ test is distinguishable. *See Rothfeldt v. Acting Comm'r of Soc. Sec. Admin.*, 669 F. App'x 964, 965–68 (11th Cir. 2016). In that case, Rothfeldt had been in special education classes and stopped school in sixth grade, could not read or write, had worked for a landscape company for six months ten years earlier, was homeless and living in the woods, had no friends, occasionally gave an acquaintance wood carvings in exchange for doing his laundry, and could not pay bills, but could perform some activities of daily living like taking public transportation, shopping for groceries, and bathing and dressing himself. *Id.* at 965. Rothfeldt specifically requested an IQ test, and the ALJ denied the request. *Id.* at 966. The Eleventh Circuit found the record did "not support the ALJ's implicit conclusion that Rothfeldt lacked deficits in adaptive functioning" and therefore he could have met the requirements of Listing 12.05 if he had a valid IQ score. *Id.* at 967–68. McRaney's case is different because McRaney did undergo a consultative exam and a state agency psychiatrist explained further IQ testing would not be necessary because of credibility issues, and she shows a much greater capacity for adaptive functioning by taking care of her child, tending to her personal care needs, preparing meals, performing routine household chores, driving, shopping, checking her bank account and other information on the internet, watching television and movies, reading, and using the computer, visiting her mother regularly, and going to church twice a week.

[26]McRaney asks the Court to remand with instructions to award benefits. *See* Doc. 20 at 24. A court may reverse and remand for an outright award of benefits if the Commissioner "has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Even if the ALJ reversibly erred, remand for further proceedings, not a reversal for an award of benefits, would be the appropriate relief. The evidence does not establish "disability without any doubt." *See Shalala*, 985 F.2d at 534 (quoted).

## VI.   Recommendations

I recommend:

**(1)**     affirming the Commissioner's decision;

**(2)**     directing the Clerk of Court to enter judgment under sentence four of 42 U.S.C. § 405(g) in favor of Nancy A. Berryhill and against Amber I. McRaney and affirming the Commissioner's decision; and

**(3)**     directing the Clerk of Court to close the file.[27]

**Entered** in Jacksonville, Florida, on August 22, 2018.

_____
Patricia D. Barksdale
*United States Magistrate Judge*

c:     The Honorable Marcia Morales Howard
        Counsel of Record

---

[27]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.